

# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN 11, TEXAS

**PRICE DANIEL**
ATTORNEY GENERAL

March 20, 1947

Hon. J. Alton York,
Chairman, Insurance Committee
The Senate of the State of Texas
Austin, Texas

Opinion No. V-98

Re: Whether S. B. Nos. 183
and 213, authorizing
cooperative rate making
practices, exempt such
activities from the
antitrust laws of Texas.

Dear Sir:

Your request is as follows:

"The Committee on Insurance voted yes-
terday in its meeting to submit S. B. Nos.
183 and 213 to your Department to see if
they (S. B. No. 183 and No. 213) would, if
enacted as Texas statutes, exempt any of the
activities in connection with the insurance
business, affected by such bills, from the
Anti-Trust or monopoly laws of Texas."

We have made a study of these two bills
which were submitted to this office along with Commit-
tee Amendments and will confine our opinion and discus-
sion to Committee Amendment No. 1 and Committee Amend-
ment No. 1 to Committee Amendment No. 1 to S. B. 183,
and to S. B. 213.

It is also noted that Sec. 17 of the amend-
ed S. B. 183, designed to repeal certain laws, leaves
blank the acts or articles of our statutes which are by
it repealed. We will therefore assume that no specific
reference will be made in Sec. 17 to any of the acts or
articles of our statutes specifically dealing with anti-
trust matters.

We will, in this opinion, usually refer to
"the legislation" or "the bills" and our remarks will
be applicable to either of the bills unless reference

to only one of them is indicated.  This is because the theme and arrangement of the two pieces of legislation are, for practical purposes, the same.

At the outset, we wish to say that the subject of insurance and the complicated methods in use today in the formulation of rates, plans, schedules, manuals, etc., are subjects of lifetime study by experts. Therefore, we are necessarily restricted to an analysis of the broad scope and plan of the proposed legislation in an effort to determine whether or not such plan operates to exempt any activities therein authorized from the operation of the antitrust statutes.

The purpose  of the legislation is stated to be:

"To promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate or unfairly discriminatory, and to authorize and regulate cooperative action among insurers in rate making and in other matters within the scope of this act.  Nothing in this act is intended (1) to promote or discourage reasonable competition, or (2) to prohibit, or encourage except to the extent necessary to accomplish the above mentioned purposes, uniformity in insurance rates, rating systems, rating plans or practices.  This act shall be liberally interpreted to carry into effect the provisions of this section."  (Emphasis supplied.)

The legislation provides that rates shall not be excessive, inadequate or unfairly discriminatory. The legislation provides that due consideration shall be given to the experience of the industry as to losses, and other pertinent statistical data.

Provisions are then made requiring the filing by the insurance companies, or by rate-making organizations authorized by them, of rate schedules with the Board of Insurance Commissioners which, in turn, is directed to review the rates proposed.  Provision is made for the rate to become effective unless disapproved by the Board within certain time limitations.  But in any event, should the Board fail to automatically review a rate or rate plan, a review by the Board may be initiated in one of several ways by the Board or other inter-

ested parties.

Rating organizations are authorized, and certain powers are given to the Board of Insurance Commissioners to supervise such organizations. Provisions are made for exceptional circumstances, where deviations are allowed as to certain types of insurance, from filed schedules and rate plans. Other provisions regulate the activities and operations of these rating organizations.

Certain penalties are provided for violation of the provisions of the statutes and the orders of the Board, and judicial review is authorized.

We will first examine our antitrust laws to determine the acts prohibited in connection with the making of insurance rates. By Article 7429, R.C.S., it is provided that "any and all trusts, monopolies and conspiracies in restraint of trade, as herein defined, are prohibited and declared to be illegal." The Article refers to the Act of 1903, which is partly contained in Articles 7426, V.C.S., defining "trusts", 7427, V.C.S., defining "monopolies", and 7428, V.C.S., dealing with conspiracies against trade. Criminal statutes are to similar effect.

Article 7426, V.C.S., provides that a "trust" is a combination of capital, skill or acts by two or more persons, firms, corporations or associations of persons, or either two or more of them for either, any or all of the following purposes:

"  .   .   .   .

"2. To fix, maintain, increase or reduce  .   .   . the cost of insurance.   .   .   .

"  .   .   .   .

"4. To fix or maintain any standard or figure whereby  .   .   . the cost of  .   .   . insurance  .   .   . shall be in any manner affected, controlled or established.

"5. To make, enter into, maintain, execute or carry out any contract, obligation or agreement by which the parties thereto bind, or have bound themselves  .   .   . or by which they shall agree in any

manner to keep the . . . charge for
. . . insurance . . . at a fixed or
graded figure, or by which they
shall in any manner affect or main-
tain the . . . cost of . . . insur-
ance . . . between them or them-
selves and others to preclude a free
and unrestricted competition among
themselves or others in the . . . business
of . . . insurance . . . or by which
they shall agree to pool, combine or
unite any interest they may have in
connection with the . . . charge for
. . . insurance . . . whereby its
price or such charge might be in any
manner affected."

Article 7427, V. C. S., provides:

"A monopoly is a combination or
consolidation of two or more corpora-
tions when effected in either of the
following methods:

"1. When the direction of the
affairs of two or more corporations
is in any manner brought under the
same management or control . . .
where such common management or con-
trol tends to create a trust as de-
fined in the first Article of this
statute."

It is manifest by these statutes that if
the purpose of the combination described is to fix, or
affect the cost of insurance, the combination is prohib-
ited. It is also manifest that if a corporate combina-
tion tends to create a trust as defined it is prohibited.

We will now examine the proposed legislation
to determine whether practices are authorized which are
inconsistent with the prohibitions of our antitrust laws
as pointed out in the above excerpts from the statutes.

The obligation to file its rates with the
Board of Insurance Commissioners may be satisfied under
this legislation by any insurer by "becoming a member of
or a subscriber to, a licensed rating organization which
makes such filing and by authorizing the Board to accept

such filing on its behalf," it being provided that membership or subscription is not compulsory.

The legislation then provides that a "corporation, an unincorporated association, a partnership or an individual," may be licensed by the Board as a rating organization. The legislation provides that each rating organization shall promptly notify the Board of any changes in its constitution, its articles of agreement or association, or its certificate of incorporation, and its by-laws, rules and regulations governing the conduct of its business, thereby indicating that operations of the rating bureaus shall be the subject of binding agreement between it and its various members or subscribers. The legislation then provides "co-operation among rating organizations or among rating organizations and insurers in rate making . . . is hereby authorized." The legislation further provides "every member of or subscriber to a rating organization shall adhere to the filing made on its behalf by such organization" with certain provisions for exceptions where allowed by the Board.

This legislation, then, obviously authorizes acts which, in the absence of such legislation, would be directly contrary to the antitrust laws. If the purpose of any rating organization is to establish a standard by which the cost of insurance is to be in any manner affected, its operation is prohibited by existing antitrust laws. Manifestly, no rating organization could exist without some type of agreement or understanding, nor would its services be of any value if they did not in some manner affect the ultimate rate or premium which is charged by its subscribers or members.

It would be impractical for us to speculate on the various ways in which such organizations might operate in violation of other provisions of our antitrust laws. We do wish to point out, however, that in addition to authorizing the rating activities mentioned, the legislation tends to make the result of the activities of the rating organizations binding upon its members and subscribers. Certainly in an antitrust action in which the charge is that of fixing rates, an adequate defense would be presented to the effect that the activities are specifically authorized by this proposed legislation. To that extent the insurers and rating organizations would be immune from prosecution. The legislation, in effect, attempts to make the Board of Insurance Commissioners a

policing organization with powers to censure the results
of the activities of such combinations.  Should it be
contended in an antitrust action that those insurers which
participate in the co-operative rate making activities
are in fact restraining trade, or accomplishing other re-
sults contrary to the antitrust laws, an obvious answer
would be presented that at least part of such fact issue
was predetermined by the Board of Insurance Commission-
ers, when it is determined that the rates promulgated
were not excessive, inadequate or unfairly discriminatory.
The only basis then for an antitrust action which might
have any hope of success would be one wherein the charges
go behind the action of the Board of Insurance Commission-
ers and in effect assert that a combination exists to pre-
vent a fair hearing or determination by the Board or which
assert other matters over which the Board is given no
control by the proposed legislation.

     With the mantle of legality established by
the proposed legislation for the activities therein recog-
nized, authorized, and encouraged, we next look to the
provisions of the Act to see whether or not the Board of
Insurance Commissioners is given sufficient authority to
effect the censureship necessary to prevent monopolistic
practices.  In considering this matter, we are concerning
ourselves with both the powers given to the Board and with
the means provided by the Legislature to carry out those
powers.  Obviously, a grant of power to the Board would
mean little if it were not also provided with the means
to procure adequate personnel, sufficiently trained in
investigation and rate making, to accomplish a thorough
consideration of every rating plan or system filed with
it.  It will be noted that this legislation places the
burden upon the Board or any person objecting to a filed
rate rather than upon the insurer or rating organization
which files the rate.  The implications and consequences
of such a shift of burden are immense, in practical ap-
plication.  In addition thereto, we see nothing in this
legislation to prohibit prolific filings, the volume and
variety of which might easily swamp the Board of Insur-
ance Commissioners, thereby rendering practically impos-
sible a thorough and careful consideration of each rate
or plan filed with the Board.  In addition thereto, the
legislation places a time limit of 15 days, with certain
provisions for extension, for consideration by the Board,
which appears to be an extremely short period of time in
view of the fact that a rate plan or schedule may have
been the subject of investigation, study and considera-
tion by the proposing organization for a period of years.

The provision for review by the court is couched in language which would indicate that the court can in effect overrule policies, in specific cases, which have been set by the Board. To the extent that such provision constitutes a diversification of responsibility, there is the possibility of a lack of uniformity, and confusion, which might be vital to an effective policing of antitrust tendencies.

You are therefore advised that in our opinion, this legislation, if enacted, would exempt many of the activities in connection with the insurance business affected by such bills, from the antitrust laws of Texas.

It is our understanding, and the emergency clause of Senate Bill 213 indicates, that this legislation is designed to effect the exemption of the insurance companies and organizations from the operation of the Sherman Antitrust Act after January 1, 1948, as contemplated by Public Law 15. This opinion should not be construed as in any manner passing upon the efficacy of the proposed legislation to accomplish that purpose. This opinion is restricted to the interpretation of the Texas Antitrust Statutes as requested in your letter and does not cover other matters such as the effect, if any of this exemption on enforcement of the antitrust statutes as to other activities not exempt by this legislation.

## SUMMARY

S. B. 183, as amended, and S. B. 213, in the form presented, authorizing co-operative rate making practices by insurance companies, subject to certain control and disapproval of rates by the Board of Insurance Commissioners, exempt many of the activities therein authorized from the antitrust laws of Texas.

Yours very truly,

ATTORNEY GENERAL OF TEXAS

APPROVED MARCH 20, 1947

*Price Daniel*

ATTORNEY GENERAL OF TEXAS

By *Ned McDaniel*
Ned McDaniel
Assistant

By *J. A. Amis Jr.*
J. A. Amis Jr.
Assistant

NM:rt:wb